SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
A Limited Liability Partnership
Including Professional Corporations
STEPHEN S. KORNICZKY, Cal. Bar No. 135532
skorniczky@sheppardmullin.com
MARTIN R. BADER, Cal. Bar No. 222865
mbader@sheppardmullin.com
ERICKA J. SCHULZ, Cal Bar No. 246667
eschulz@sheppardmullin.com
12275 El Camino Real, Suite 200
San Diego, California 92130-2006
Telephone:858.720.8900
Facsimile:858.509.3691

DANIEL L. BROWN
dbrown@sheppardmullin.com
30 Rockefeller Plaza, 39th Fl.
New York, New York 10112
Telephone: 212.634.3095
Facsimile: 212.653.8701

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

### FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| U-BLOX AG, U-BLOX SAN DIEGO, INC., AND U-BLOX AMERICA, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>SISVEL INTERNATIONAL S.A., SISVEL US, INC., and 3G Licensing S.A.<br><br>Defendants. | Case No. '20 CV 0494 AJB NLS<br><br>**COMPLAINT FOR:**<br><br>**(1) Breach Of Contract;**<br>**(2) Declaratory Judgment;**<br>**(3) Antitrust Monopolization In Violation Of Section 2 Of The Sherman Act and Unlawful Asset Acquisition in violation of Section 7 of the Clayton Act;**<br>**(4) Declaratory Judgment of Unenforceability of U.S. Patent No. 7,433,698; and**<br>**(5) Declaratory Judgment of Unenforceability of U.S. Patent No. 8,364,196.** |

Plaintiffs u-blox AG, u-blox San Diego, Inc., and u-blox America, Inc. (collectively, "u-blox" or "Plaintiffs"), by and through the undersigned counsel, file this Complaint against Sisvel International S.A., Sisvel US, Inc., and 3G Licensing S.A. ("3G Licensing") (collectively, "Sisvel" or "Defendants") as follows.

## INTRODUCTION

1. u-blox, a leading fabless semiconductor provider of embedded positioning and wireless communication products, brings this lawsuit against Sisvel because of Sisvel's refusal and failure to license its alleged standard essential patents ("SEPs") on fair, reasonable, and non-discriminatory (also known as "FRAND") terms and conditions, and to prevent and restrain Sisvel's anticompetitive conduct and other violations of the law.

2. Sisvel acquired ownership and/or the right to grant non-exclusive licenses to a number of patents it asserts are essential to the second generation ("2G"), third generation ("3G"), and/or fourth generation ("4G") cellular technology standards established by the European Telecommunications Standards Institute ("ETSI"), a standard setting organization ("SSO"). However, Sisvel did not develop, create and/or promote the cellular technology it asserts is covered by its alleged standard essential patents ("SEPs"). Sisvel's SEPs were previously owned by other entities including, for example, Nokia, Research in Motion, Mitsubishi, Orange, and KPN (the "transferors" or "prior owners"). In acquiring these alleged SEPs, Sisvel intentionally sought to accumulate and aggregate them into a portfolio with a dominant position in the market for licensing them, and improperly seek unreasonable royalty rates.

3. As explained herein, Sisvel and the prior owners of Sisvel's alleged SEPs are and/or were members of ETSI and, thus, the SEPs related to 2G, 3G, and 4G that Sisvel has the right to license are subject to ETSI's Intellectual Property Rights ("IPRs") Policy. The ETSI IPR Policy requires its members to disclose any intellectual property rights ("IPR") that entity has in technology related to a standard

under consideration, and requires the entity to agree to an irrevocable obligation to be prepared to offer licenses on a FRAND basis.

4.     Sisvel and/or the prior owners have submitted a number of declarations to ETSI identifying hundreds of patents as potentially essential to the 2G, 3G, and/or 4G cellular standards, and agreeing to the FRAND commitment.  As ETSI members proposing technology in the standardization process, ETSI relied on such FRAND commitments to lock-in the technology into the standard.

5.     Consistent with the intent of ETSI's IPR Policy, and relying on the assurances of FRAND commitments by SEP holders, such as Sisvel and/or prior owners, u-blox has invested substantial resources in developing and marketing cellular modules that are compatible with the 2G, 3G, and/or 4G standards worldwide, including in the United States and California.

6.     However, now that this lock-in has occurred and alternative technologies have been excluded from the standards, it has become clear that Sisvel never intended to license its alleged SEPs on FRAND terms and conditions.

7.     u-blox is a ready and willing licensee to Sisvel's alleged SEPs, but Sisvel's license related conduct plainly violates its FRAND commitments, including but not limited to:

- Demanding royalty rates that are far in excess of the fair and reasonable value of Sisvel's SEPs;
- Upon information and belief discriminating against u-blox and violating ETSI guidelines by demanding u-blox pay higher royalty rates than other implementers;
- Demanding u-blox pay royalties for alleged SEPs covering portions of the standard not implemented by certain u-blox products;
- Demanding u-blox pay royalties for alleged SEPs that the prior owners failed to timely disclose prior to the standard being adopted; and
- Demanding royalty rates that do not account for the expiration of Sisvel's alleged SEPs over the course of the license.

8.      In addition, in a blatant attempt to coerce u-blox to enter into a license that is not on FRAND terms, Sisvel has engaged in a course of conduct to damage u-blox's relationships with its customers and, ultimately, to damage u-blox. Specifically, in 2017, ignoring u-blox's request for a FRAND license, Sisvel targeted u-blox's customers and downstream manufacturers, including Xirgo Technologies, LLC ("Xirgo"), by sending demand letters and suing Xirgo in district court.

9.      Upon information and belief, Sisvel was well aware of the fact that: (i) u-blox entered into relationships with its customers in reliance on Sisvel's and the prior owners' commitment to offer a license to the alleged SEPs on FRAND terms, and (ii) u-blox's customers and their downstream manufacturers relied on u-blox to obtain a license from SEP holders such that they may design their products and incorporate u-blox's technology into their products.

10.     Sisvel has demanded greatly inflated patent royalties that are based off the final end product, rather than the smallest saleable unit that practices the alleged SEPs—the u-blox components.  These inflated royalties Sisvel seeks, going back years, far exceed the profit margin of the u-blox components, even though pricing decisions had been made years ago, and the prior owners could have sought a license from u-blox years ago.

11.     In response to Sisvel's unreasonable royalty rate demands, u-blox provided Sisvel with a counter-offer, along with a detailed explanation of how that counter-offer is FRAND, and reiterated that it was willing to negotiate a FRAND license with Sisvel.

12.     Unfortunately, however, Sisvel refused to negotiate in good faith with u-blox for a FRAND license.  Among other things, Sisvel appears intent to pressure u-blox into a license that is not FRAND by interfering with u-blox's important customer relationships.

13.     As a result of the foregoing, u-blox has no choice but to turn to the

Court to establish FRAND terms and conditions, including a royalty rate, for a license to Sisvel's alleged SEPs, and to enjoin Sisvel from engaging in anticompetitive conduct, including, but not limited to, demanding non-FRAND rates from implementers, and seeking royalties for technology that was adopted into the standards well before Sisvel and/or the prior owners properly disclosed their IPRs to ETSI and its members—thereby rendering the alleged SEPs unenforceable.

## THE PARTIES

### A.    u-blox

14.    Plaintiff u-blox AG is a corporation organized and existing under the laws of Switzerland, having its principal place of business in Zürcherstrasse 68, 8800 Thalwil, Switzerland.

15.    Plaintiff u-blox San Diego, Inc. is a wholly-owned subsidiary of u-blox AG.  u-blox San Diego, Inc. is a corporation organized and existing under the laws of Delaware, having its principal place of business at 12626 High Bluff Drive #200, San Diego, California 92130.

16.    Plaintiff u-blox America, Inc. is a wholly-owned subsidiary of u-blox AG.  u-blox America, Inc. is a corporation organized and existing under the laws of Delaware, having its principal place of business at 1902 Campus Commons Drive Suite 310, Reston, Virginia 20191.

17.    u-blox delivers leading wireless technology to reliably locate and connect people and devices.  u-blox is a leading developer of global positioning technology, including products and services based on Global Navigation Satellite Systems (GNSS), including GPS and GALILEO, for the automotive, mobile communications, and infrastructure markets.  u-blox began offering wireless products and services in 2009.

18.    In 2011, u-blox acquired Fusion Wireless, a San Diego, California based provider of CDMA wireless modules for consumer and machine-to-machine (M2M) applications in North America.  As u-blox's Chief Executive Officer

explained at the time, "[t]he acquisition of Fusion Wireless immediately gives u-blox new, cutting-edge wireless module products plus access to the huge embedded CDMA market in North America for both consumer and M2M applications.  It also expands our wireless module technology roadmap to cover all popular standards used in the Americas based on a layout-consistent form factor.  This will allow our customers to easily adapt their products to match geographical requirements as well as overcome network coverage limitations."

19.     Fusion Wireless has been integrated into u-blox as u-blox San Diego, Inc., and the combined company continues to develop and market wireless communications modules worldwide —  including in California and throughout the United States.  Today u-blox offers a wide range of high-quality, scalable cellular modules perfectly suited for vehicle, industrial, and M2M applications, and mass-market consumer products with demanding size, cost, and quality requirements.

20.     u-blox's wireless communications modules are capable of incorporating a wide variety of cellular technologies.  Supported cellular technologies provide global geographic coverage and include at least 2G, 3G, and/or 4G standards.  Even within the 4G standard, u-blox offers a wide range of products practicing different iterations and categories of the 4G standard designed for vastly different tasks, including NB-IoT (LTE Cat NB1), LTE Cat M1, LTE Cat 1, LTE Cat 4, and LTE Cat 6.  These different cellular technologies offer different levels of performance and cost benefits.  For example, u-blox's LTE Cat 1, LTE Cat M1, and NB-IoT modules are designed to support a wide range of Internet of Things (IoT) applications requiring medium to very low data rates.  This includes a broad spectrum of applications covering speeds high enough for voice and video streaming, as well as those that need optimized performance for ultra-low power consumption and extended in-building range.  By contrast, u-blox's high speed LTE Cat 4 and LTE Cat 6 modules meet the needs of applications requiring high data rates, such as for HD video transmission and infotainment solutions.  u-blox sells

-5-

standard compatible products in California and around the world.

**B.    Sisvel**

21.    Upon information and belief, Defendant Sisvel International S.A. ("Sisvel SA") is organized under the laws of Luxembourg, with its principal place of business at 6, Avenue Marie Therese 2132, Luxembourg Grand Duchy of Luxembourg.

22.    Upon information and belief, Defendant Sisvel US, Inc. ("Sisvel US") is a Virginia corporation, with its principal place of business at 10250 Constellation Blvd 2nd Floor, Los Angeles, CA 90067.

23.    Upon information and belief, Defendant 3G Licensing is a wholly owned subsidiary of Sisvel SA, and is located at 6, Avenue Marie-Thérèse, L-2132 Luxembourg Grand Duchy of Luxembourg.

24.    Upon information and belief, on February 14, 2018, Sisvel SA contributed its 3G patents (formerly owned by Nokia) to 3G Licensing's 3G licensing program.

25.    Upon information and belief, Sisvel SA has and does dictate and control the actions of Sisvel US and 3G Licensing as described herein.

26.    Upon information and belief, Sisvel US has or had offices and employees in California and/or regularly conducts business in California, including an office at 10250 Constellation Blvd. 2nd Floor, Los Angeles, CA 90067, which supports Sisvel SA's patent licensing business.

27.    Upon information and belief, Sisvel purports to own approximately thousands of U.S. patents and non-U.S. patents spanning multiple jurisdictions and telecommunication technologies related to 2G, 3G, and 4G cellular technology, and provides brochures listing the patents in its portfolio on its website.  *See* Exhibits 1-3 (Sisvel's 3G (MCP) patent list, Sisvel's 4G patent Brochure, and 3G Licensing's 3G Patent List Brochure).

28.    Upon information and belief, Sisvel derives revenues primarily from

-6-

1  patent licensing and aggressively seeks to monetize its intellectual property

2  portfolio by targeting companies like u-blox that sell standards compatible products

3  in California and around the world.

4        29.    Upon information and belief, Sisvel SA directs employees of Sisvel US

5  in California to negotiate patent licenses with potential licensors in California,

6  including u-blox, regarding the 2G, 3G, and 4G patents for which Sisvel SA owns,

7  manages, and/or controls and/or for which 3G Licensing owns, manages, and/or

8  controls.

9        30.    Upon information and belief, Sisvel SA directs employees of Sisvel

10  and/or related companies to negotiate patent licenses with potential licensors in

11  California, including u-blox, regarding the 3G and 4G patents for which Sisvel SA

12  owns, and/or for which 3G Licensing owns, manages, and/or controls.

13  **JURISDICTION AND VENUE**

14        31.    u-blox brings this action for damages, declaratory relief, injunctive

15  relief, costs of suit, and reasonable attorneys' fees arising under, *inter alia*, the

16  patent laws of the United States, 35 U.S.C. § 1 *et seq.*; Section 2 of the Sherman

17  Antitrust Act, 15 U.S.C. § 2; Section 7 of the Clayton Act, 15 U.S.C. § 18; and the

18  Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.  Accordingly, this Court

19  has jurisdiction to hear this case pursuant to 28 U.S.C. § 1331 and Section 4 of the

20  Clayton Act, 15 U.S.C. § 15.

21        32.    This Court has subject matter jurisdiction over u-blox's pendent state

22  law claim pursuant to 28 U.S.C. § 1367, because u-blox's state law claim arises

23  from the same factual nucleus as its federal law claims.

24        33.    This Court has personal jurisdiction over Sisvel based on the antitrust

25  laws, and at least because Sisvel (1) committed intentional acts, including the

26  wrongful conduct described herein, that give rise to the causes of action herein in

27  this jurisdiction, (2) expressly aimed such acts at u-blox in San Diego, California,

28  among other places, and on information and belief at others in this State, and (3)

1  caused harm that Sisvel knew was likely to be suffered in this State, including the

2  harm to u-blox described herein.

3       34.    For example and without limitation, Sisvel regularly and knowingly

4  directs its licensing business to this judicial district and other areas of California,

5  including through its Los Angeles, California office.  As described herein, Sisvel's

6  licensing business includes demanding supra-FRAND royalties from u-blox,

7  including u-blox San Diego, and from others in this State, including u-blox's

8  customers for Sisvel's SEPs.  Sisvel knew such demands would cause harm to u-

9  blox in San Diego, California.  Sisvel's license negotiations and correspondence

10  with u-blox on behalf of Sisvel in connection with the license negotiations described

11  herein were knowingly and intentionally conducted with u-blox's representative in

12  San Diego, California by Sisvel's representative in California.  Additionally, Sisvel

13  knowingly and intentionally caused harm to u-blox in San Diego, California by

14  seeking supra-FRAND rates for FRAND encumbered SEPs. u-blox's claims arise

15  from Sisvel's intentional conduct in and expressly aimed at California.

16       35.    In addition, this Court has personal jurisdiction over Sisvel at least

17  because (1) Sisvel maintains an office in Los Angeles, California, (2) this office

18  supports or supported Sisvel's licensing business described herein, (3) the conduct

19  giving rise to the causes of action described herein includes conduct directed at u-

20  blox in San Diego, California by at least Sisvel and/or 3G Licensing's representative

21  based out of this office, and (4) Sisvel acted as a single entity with all Sisvel

22  subsidiaries and 3G Licensing when negotiating with u-blox in San Diego.

23       36.    Venue is proper under Section 12 of the Clayton Act §12.

24       37.    Venue is proper in this judicial district pursuant to 28 U.S.C.

25  §§ 1391(b) (2) as the licensing negotiations giving rise to the complaint were

26  directed at u-blox's employees in this judicial district.

27  ///

28  ///

1

**FACTUAL ALLEGATIONS**

2      38.    As explained below, u-blox brings this action because Sisvel and/or the

3  prior owners breached their commitments to ETSI, 3GPP, their members and

4  affiliates, and third party beneficiaries to these commitments — including u-blox —

5  to timely disclose their alleged 2G, 3G and/or 4G SEPs to ETSI and to license these

6  SEPs on FRAND terms and conditions.

7      **Standard Setting Organizations and Intellectual Property Rules**

8      39.    SSOs, such as ETSI, are voluntary membership organizations whose

9  participants engage in the development of industry standards for the benefit of their

10  members and affiliates, third parties implementing the standards, and consumers.

11      40.    SSOs and the standards they promulgate play an important role in the

12  technology market by allowing companies to agree on common technology

13  standards so that compliant products implementing the standards will work together.

14  Standards also lower costs by increasing product manufacturing volume and inter-

15  brand competition and by eliminating switching costs for consumers and/or

16  manufacturers who want to switch from products, services, or components provided

17  by one company to those provided by another company.

18      41.    Compatibility standards are commonly adopted in industries in which

19  complementary products or components, manufactured by different firms, must

20  interoperate, interface, or communicate with each other.  When many companies

21  produce components that must interoperate in a complex system, the collaboration

22  of industry participants is often the most efficient way to establish the requisite

23  standards.  This collaboration often takes place in the context of formal SSOs that

24  promulgate standards and set participation rules for their members.  The

25  telecommunications industry has benefited from increased interoperability across

26  devices and networks, and the 3G and 4G cellular communications standards at

27  issue here are examples of compatibility standards.

28      42.    While standards deliver economic benefits to innovators, firms that

-9-

implement the standards, and consumers, standards can also potentially impose excessive and unfair costs on these same constituencies, some of which stem from opportunistic behavior by owners of patents that cover or are declared to cover various technologies necessary to practice a standard. As a result, SSOs have adopted IPR policies to reduce those costs. When adhered to, these IPR policies benefit all of the constituencies. Standard setting participants receive the opportunity to have their technology incorporated into the standard and to receive compensation for its use in a larger number of devices that operate using the standard. As the standard becomes more widely adopted and used, the patent holders receive greater total compensation. SSO participants also enjoy benefits independent of potential royalty income, including recognition of leadership in the technology, increased demand for participants' products, advantages flowing from familiarity with the contributed technology potentially leading to shorter development lead times, and improved product compatibility.

43.     Firms that implement the standard receive assurance that they will always have access to essential patents and will not be exploited by patent holders or disadvantaged relative to other implementers if they invest in implementing the standard or developing innovative products that may operate with the standard. Likewise, consumers and businesses benefit from continued innovation, reduced costs, and other efficiencies from widespread interoperability and economies of scale and scope enabled by the standard.

44.     By contrast, IPR policy breaches can chill standard-setting efforts, thus denying to standard setting participants, implementers, and consumers the many benefits of standard setting.

45.     In addition, while there are many benefits to collaborative standard setting, collaborative standard setting can also raise antitrust concerns, because, for example, collaborative standard setting has the potential to empower any individual firm that has IPR over one or more technologies that are essential to the standard to

1   block other firms from practicing the standard or to significantly raise their costs of

2   doing so.  Outside of the standard setting context, the extent to which a patent holder

3   will be able to profit from an invention is limited by competition from alternative,

4   non-infringing technologies or products.  Thus, even though a patent gives its owner

5   the right to exclude unauthorized users, it does not necessarily confer monopoly

6   power because other constraining, non-infringing alternatives may be available.

7   However, incorporating patented technology into a standard artificially removes

8   competition from those alternatives and provides the patent owner with incremental

9   market power that can be exploited.  This incremental market power is due to the

10  elimination of alternatives once the patents are incorporated into the standard, not

11  the inherent technical value of the patents (*i.e.*, the contribution of the patented

12  technology relative to the alternatives — the *ex ante* value).

13       46.    SEP owners gain the power to exclude or exploit because the process of

14  standardization transforms what may have been only marginally valuable IP into

15  essential IP needed by all firms that intend to manufacture, use, or sell standard-

16  based products.  The U.S. Department of Justice and Federal Trade Commission

17  have recognized the potential for SEP owners to abuse the power gained through

18  standardization.  The effect is that the competitive constraints on the SEP owner's

19  licensing behavior are eliminated after standardization.  This elimination of

20  alternatives confers market power on SEP owners relative to the pre-standard

21  situation wherein alternatives (including the option of not including the relevant

22  functionality at all) are potentially available in the technology market(s) and can

23  constrain anticompetitive licensing behavior of the SEP owner.

24       47.    Once a standard is set, and especially as manufacturers invest in and

25  begin manufacturing products that can use or operate with the standard, it can be

26  infeasible to revise the standard in order to avoid a SEP.  Revising a standard can be

27  very costly to the industry implementing that standard because it may involve

28  breaking the compatibility and interoperability that the standard provides.  Thus,

changing a standard to eliminate a SEP whose owner attempts to unfairly exercise undue market power gained from standardization is generally not feasible.  In sum, once an industry has adopted a particular standard, there are no alternative technologies that can implement a given functionality within the wording of the standard.  The *ex post* relaxation of competitive constraints on the SEP owner through the elimination of alternatives, together with the *ex post* negotiation of licenses, gives rise to the possibility that a SEP owner will act opportunistically and "hold up" some or all standard implementers by extracting higher royalties *ex post* than it could have bargained for *ex ante*.

48.     To prevent the exploitation of the SEP owner's market power in this situation, there must be other constraints on the SEP owner's licensing behavior, such as obligations to license on FRAND terms.  To this end, SSOs typically impose IPR rules on their participants to protect against (or minimize the likelihood of) opportunistic, anticompetitive behavior by SEP owners.  Such opportunistic behaviors expropriate at least a portion of an implementer's returns from sunk investments in innovation.  If an implementer or potential implementer anticipates that there is a material risk of opportunistic behavior, its incentives to engage in innovative activities will be reduced or possibly even eliminated, particularly when the opportunistic SEP holder seeks to hold up the implementer for all or a large part of the profits from the implementer's innovations, complementary products, or services.  By protecting against opportunistic behavior, SSO rules pertaining to IPR are intended to provide an environment that promotes investment, innovation, and technological progress.  These IPR rules typically call for SSO participants to identify through timely declaration any potential SEPs covering the proposed standard and agree to license all implementers of the standard on fair, reasonable, and non-discriminatory terms.

///

///

1

**ETSI's IPR Policy**

2      49.      ETSI is an independent, non-profit SSO that is responsible for the

3   standardization of information and communication technologies, including mobile

4   cellular technologies, for the benefit of its members and affiliates.

5      50.      3GPP is a collaborative project that develops standards in partnership

6   with a group of recognized SSOs in the information and communication industry,

7   including ETSI.

8      51.      ETSI, in partnership with 3GPP, has been involved in standardizing a

9   number of 2G, 3G, and 4G mobile cellular technologies.

10      52.      The ETSI IPR Policy[1] requires its members to disclose on a timely,

11   bona fide basis all intellectual property rights that they are aware of and believe may

12   be or may become essential during the development of an ETSI standard.  The ETSI

13   IPR Policy, Clause 4.1 provides that: "each MEMBER shall use its reasonable

14   endeavours [sic] to timely inform ETSI of ESSENTIAL IPRs it becomes aware of.

15   In particular, a MEMBER submitting a technical proposal for a STANDARD shall,

16   on a bona fide basis, draw the attention of ETSI to any of that MEMBER's IPR

17   which might be ESSENTIAL if that proposal is adopted."  This obligation to

18   disclose extends to members' affiliates as well.  In other words, if a member is

19   going to receive an economic benefit from having technology covered by its

20   intellectual property included in the standard, other ETSI members should be

21   informed of this ***before*** making their final decision to adopt such technology into the

22   standard, and in particular where such technology was submitted in a technical

23   proposal by the IPR holder.

24      53.      Additionally, ETSI's IPR Policy requires that participants disclose their

25   relevant IPR during the development of a standard so that ETSI may request that

26   members owning patents potentially essential for the practice of a standard

27   _____

28
[1] *See* ETSI IPR policy at https://www.etsi.org/images/files/IPR/etsi-ipr-policy.pdf,
last visited March 12, 2020, which has remained substantively similar since 1994.

-13-

COMPLAINT

irrevocably commit to license those patents on FRAND terms and conditions to anyone practicing the standard.  Specifically, clause 6 of ETSI's IPR Policy states:

> When an ESSENTIAL IPR relating to a particular STANDARD is brought to the attention of ETSI, the Director of ETSI shall immediately request the owner to give within three months an undertaking in writing that it is prepared to grant irrevocable licenses on fair, reasonable and non-discriminatory [FRAND] terms and conditions under such IPR…  The above undertaking may be made subject to the condition that those who seek licenses agree to reciprocate.

ETSI IPR Policy, § 6.1.

54.     Clause 6.1 lists "MANUFACTURE, including the right to make or have made customized components and sub-systems to the licensee's own design for use in MANUFACTURE," as among the uses for which SEP holders must make mandatory FRAND licensing commitments.  *Id.*

55.     FRAND commitments, pursuant to Clause 6 of the ETSI IPR Policy, "shall be interpreted as encumbrances that bind all successors-in-interest."

56.     ETSI defines "essential" as follows:

> "ESSENTIAL" as applied to IPR means that it is not possible on technical but not commercial grounds, taking into account normal technical practice and the state of the art generally available at the time of standardization, to make, sell, lease, otherwise dispose of, repair, use or operate EQUIPMENT or METHODS which comply with a STANDARD without infringing that IPR.  For the avoidance of doubt in exceptional cases where a STANDARD can only be implemented by technical solutions, all of which are infringements of IPRs, all such IPRs shall be considered ESSENTIAL.

ETSI IPR Policy, Annex 6.

57.     Although ETSI defines the term "essential," it does not make any attempt (nor, in general, do any SSOs) to ascertain whether the patents declared as potentially "essential" to a standard are valid and enforceable, or whether they are, in fact, technically essential.  Which patents are deemed potentially "essential" to a

-14-

particular standard is self-proclaimed by the declaring SSO member.

58.    If the essential IPR owner refuses to undertake the requested commitment and informs ETSI of that decision, the ETSI General Assembly must "review the requirement for that STANDARD or TECHNICAL SPECIFICATION and satisfy itself that a viable alternative technology is available for the STANDARD or TECHNICAL SPECIFICATION" that is not blocked by that IPR and satisfies ETSI's requirements.  ETSI IPR Policy, § 8.1.1.  Absent such a viable alternative, the ETSI IPR Policy requires that "work on the STANDARD or TECHNICAL SPECIFICATION shall cease." *Id.*, § 8.1.2.  In other words, ETSI will not agree to incorporate a member's technology into a standard under consideration unless the member irrevocably binds itself to granting licenses on FRAND terms.

59.    Additionally, Section 8.2 of the ETSI IPR Policy describes the procedure for addressing the non-availability of a license after the publication of a standard or technical specification. *Id.*, § 8.2. Had Sisvel submitted an IPR and disclosed to ETSI that it was actually not going to commit to FRAND rates (which is akin to a license not being available), ETSI could have used its built-in procedure for finding a solution to the issue, or in other words, finding an alternative to the standard technology which could have been adopted in the next version of the standard.

### Prior Owners' and Sisvel's IPR Declarations

60.    As an ETSI member and a participant in ETSI and/or 3GPP standardization, in conjunction with the adoption of the 2G, 3G, and/or 4G standards, the prior owners, such as, for example, Nokia, Research in Motion, Orange, KPN and Mitsubishi, made submissions to the technical bodies within ETSI and/or 3GPP, declaring that certain patents or patent applications may be or may become essential to the standards under consideration.

61.    For at least some of Sisvel's patents, the prior owners, e.g., Nokia and

others, proposed technology related to the filed patent applications which were then adopted as the standard.  However, those prior owners failed to disclose that they had filed patent applications relating to the standards they proposed and which were adopted until more than a year later when they finally filed a declaration disclosing IPR related to the adopted technology.  It is well known that ETSI members are incentivized to choose technical solutions that are free of licensing costs, and that there is a reasonable possibility that knowing an entity owned IPR related to a proposed technology could have dissuaded ETSI members to implement that technology.  *See Conversant Wireless Licensing S.A.R.L. v. Apple, Inc.*, No. 15-cv-05008-NC, Dkt. 547, at 10 (N.D. Cal. May 10, 2019).

62.     Additionally, after Sisvel acquired some of its patent portfolio, Sisvel also submitted IPR declarations for some of the patents, and agreed to enter into an irrevocable undertaking to grant licenses to its disclosed essential patents on FRAND terms and conditions.[2]

### Overview of Cellular Standards

63.     Sisvel's unlawful and anticompetitive behavior pertains to patents that it claims are essential to the 2G, 3G, and/or 4G cellular standards, which are described below.

### Early Cellular Standards

64.     The first widespread use of mobile phones began in the late 1970s and into early 1980s with analog systems, generally referred to as "1G."  The 1G system most widely deployed and most successful in the U.S. in the 1980's was AMPS

---

[2] u-blox does not accept Sisvel's or the prior owners' representation that any (or all) of the patents identified as potentially "essential" are, in fact, necessary for the compliant implementations of 2G, 3G, and/or 4G technologies; nor does u-blox concede that the particular implementations of such technologies in its products practice any of Sisvel's patents, including those identified by Sisvel in relation to these technologies.  Nonetheless, u-blox, and the entire cellular technology industry, has relied upon the prior owners' and Sisvel IPR declarations with FRAND commitments.

-16-

(Advanced Mobile Phone System).  However, there were many other regional and national systems in operation around the world at that time, leading to a fragmented market with individual regions having their own vendors and standards that were incompatible with one another.

65.     In the late 1980s, the cellular industry moved towards a second generation of mobile telephony, based on digital technology.  Such systems introduced a number of important benefits over the previous analog 1G systems, such as improved voice quality, increased system capacity, increased system security, and the ability to integrate voice and data services.

66.     For the first time, SMS (Short Messaging Service, *i.e.*, "texting" or "texts") and basic data services became available.  But there were divergent views on how to effectuate these benefits.  Thus, there were a number of different standards considered to be 2G.

67.     In Europe, a system called Global System for Mobile Communications ("GSM"), originally referred to as Groupe Spécial Mobile, evolved to become the dominant worldwide 2G standard.

68.     GSM and these newer variants are still in use today.  They can support voice service and user data rates with low to moderate data transmission speed.  However, despite the availability and widespread, global adoption of GSM, the technology was not initially widely commercialized in the United States.  In the United States, a different 2G technology, based on a different wireless air interface named Code Division Multiple Access ("CDMA"), was being strongly championed by Qualcomm.

69.     At a very basic level, CDMA operates by assigning each user a unique identifier, a "spreading code," which is used to "spread" all the digital data transmitted to or from that user.  Because each user has a unique spreading code, a user need not be assigned a specified time slot as is required with other more onerous technologies.  With CDMA, multiple users can communicate at the same

1  time (*i.e.,* simultaneously) using the same frequency by transmitting messages that
2  have been spread using different "spreading codes."

3                               **3G Standards**

4       70.    In the mid to late 1990s, the cellular industry started a push towards a
5  newer, more advanced system, able to support more users with improved reliability
6  and better handling of data services.

7       71.    Originally the hope was to adopt a single, global standard.  However,
8  over time, it became apparent that diverging regional interests would prevent a
9  single system from being adopted.  On the one hand, supporters of the GSM-based
10 standards pushed to have a system based on the GSM core network, but with an
11 enhanced Radio Access Network incorporating a new CDMA-based air interface
12 known as Wideband CDMA ("WCDMA").  This standard is known as Universal
13 Mobile Telecommunications System, or "UMTS."  On the other hand, supporters of
14 the IS-95 family of standards pushed to enhance the existing IS-95 core network and
15 CDMA air interface, to develop a new standard known as CDMA2000.

16      72.    The first UMTS standard developed by 3GPP was called Release 99,
17 and was followed by a minor "cleanup" revision called Release 4.  The first major
18 upgrade came in 2002 with Release 5, including a new feature called High Speed
19 Downlink Packet Access ("HSDPA"), which was followed by Release 6 in and
20 around early 2005 that introduced High Speed Uplink Packet Access ("HSUPA").
21 Together HSDPA and HSUPA (collectively known as High Speed Packet Access or
22 "HSPA") enhanced the download and upload speeds as compared to the original
23 baseline specification.  In 2007, Release 7 included an enhancement named High
24 Speed Packet Access Evolution ("HSPA+"), which includes a number of technical
25 modifications to support even higher data rates.  More recent releases have further
26 improved functionality.

27      73.    UMTS, as improved through the various releases, remains in
28 widespread use around the world today.

**The 4G Standard**

74.     For the first time in the evolution of cellular standards, the global cellular industry converged to a single wireless standard for use worldwide in the late 2000s:  Long Term Evolution ("LTE").  This standard was developed by 3GPP, and it provides a natural evolutionary path for both UMTS and CDMA2000 network operators and their customers.  Similar to the earlier generations, LTE also continues to evolve, including advances such as LTE-Advanced.

75.     Work began in earnest on developing LTE around 2006, under the leadership of 3GPP.  The first technical specifications, known as Release 8, were published in 2008.  Release 8 includes functionality that theoretically supports downlink data rates of about 300 Mbps and uplink data rates of about 75 Mbps.

76.     In 2011, an upgrade to LTE was published, referred to as Release 10, incorporating many features of what is known as LTE-Advanced.  This upgrade includes a number of major technical enhancements to considerably increase LTE functionality.  Commercial deployments of LTE-Advanced are in progress today.

77.     Development of the LTE standard continued beyond Release 10 with incremental improvements to the standard, including many relevant to u-blox's cellular modules.

78.     In Release 12, 3GPP specified low-price machine-communication terminals as LTE terminal Category 0.  These terminals feature a maximum data rate of 1Mbps, support for frequency division duplex and half duplex, and support for single antenna reception.

79.     In Release 13, 3GPP defined two new terminal categories.  Category M1 includes the features of Category 0, with the transceiver bandwidth limited to 1.08 MHz and support for coverage extension of approximately 15db.  These limitations have cost reduction effects for chipsets compared to Category 0.  Second, Release 13 defined the Narrowband IoT ("NB-IoT") category of devices.  NB-IoT is a subset of the LTE standard focused on indoor coverage, low cost, long battery life,

-19-

1  and high connection density.  The NB-IoT category features transceiver bandwidth

2  limited to 180kHz and support for coverage extension greater than 20db.

3      80.    As of Release 13, the LTE standard defines 19 separate categories of

4  user equipment ("UE").  These categories depend on maximum peak data rate and

5  MIMO capabilities supported by the UE.

6      81.    Cellular products and components implementing LTE are not required

7  to practice every release of the LTE standard.  For example, u-blox's components

8  that use low-speed LTE category standards do not need to incorporate all the

9  technology needed in high-speed LTE category standards.  Thus, given the variation

10  of LTE category implementations, not every u-blox product needs a license to all the

11  same LTE (4G) patents.

12                    **Hold-up and Royalty Stacking**

13      82.    Despite SSOs adopting IPR Policies incorporating FRAND

14  commitments, some SEP owners have attempted to exploit their monopoly power to

15  extract supra-competitive royalty rates after implementers are locked into the

16  standardized technology.

17      83.    The exploitation of SEPs to extract unreasonable or discriminatory

18  royalties is referred to as patent "hold-up."  The cumulative royalty burden required

19  to satisfy all SEP holders is referred to as a royalty stack.

20      84.    Hold-up harms competition and impedes implementation of standards,

21  diminishing any benefits that flow from widespread adoption of the standard.  The

22  anticompetitive effects of hold-up are magnified when the total aggregate royalty

23  stack is analyzed.  The total royalty stack must be reasonable when viewed in the

24  aggregate.  The demands of individual SEP owners must be assessed in light of the

25  total number of SEPs included in the standard and their relative technical

26  contributions.

27      85.    A number of cases that have been litigated in U.S. courts demonstrate

28  that patent hold-up is a widespread problem, with SEP owners violating their

-20-

FRAND commitments by making royalty demands significantly above the adjudicated FRAND rates. *See, e.g.*, *In re Innovatio IP Ventures, LLC Patent Litig.*, 2013 WL 5593609, at *43 (N.D. Ill. Oct. 3, 2013) (for 19 asserted patents, assessing damages of $0.0956 per unit as compared to the proposed royalty of $16.17 per unit for tablet computers); *Microsoft Corp. v. Motorola, Inc.*, 2013 WL 2111217, at *100 (W.D. Wash. Apr. 25, 2013) (determining FRAND rate of $0.03471 per Microsoft's xBox unit, as compared to Motorola's initial demand of $6-$8 per xBox unit).

86.   Courts, regulators, and economists have also made clear that to be effective, the FRAND commitments in ETSI's IPR policy should: (a) limit royalties to the value that the SEP(s) had prior to inclusion in the ETSI standard and in light of other patented and unpatented technology essential to the standard; (b) prohibit charging royalties that are higher based upon the technology being written into the standard or that capture the value of the standard itself; and (c) require non-discriminatory treatment of licensees and potential licensees.

87.   As explained below, and like the SEP owners from the aforementioned cases, an analysis of Sisvel's non-FRAND offers to u-blox for a license demonstrates that Sisvel is attempting to abuse its monopoly power to extract the hold-up value of its alleged SEPs. Sisvel's licensing offer to u-blox is completely untethered to the *ex ante* value of Sisvel's alleged SEPs, and would create an unsustainable royalty stack. In light of Sisvel's continued unreasonable demands for a license, and related conduct, u-blox has no choice but to seek a judicial determination of the terms for a fair, reasonable, and non-discriminatory license Sisvel's 2G, 3G, and 4G patents.

### Sisvel's Refusal to Offer u-blox a License on FRAND Terms

88.   As explained above, Sisvel and/or the prior owners committed to license the essential patents Sisvel holds consistent, in all respects, with the binding commitments to ETSI, 3GPP, and participants and implementers of the applicable standards. Additionally, the prior owners' FRAND commitments are binding on

-21-

Sisvel.  However, in disregard of its binding obligations, Sisvel is refusing to license its alleged SEPs to u-blox on FRAND terms and conditions.

89.    In December 2016, Chuck Hausman of Sisvel US approached u-blox's customer Xirgo, of Camarillo, California on behalf of Sisvel UK Limited, Sisvel SA and 3G Licensing.  Sisvel demanded that Xirgo license Sisvel SA and 3G Licensing's wireless patent portfolio, part of which was allegedly essential to the 2G, 3G, and 4G wireless standards.  In January 2017, in response to these demands, u-blox reached out to Chuck Hausman of Sisvel US, seeking a license to the patents identified in the Xirgo demand letters.  However, after exchanging correspondence, Sisvel maintained that it was free to choose to license its patents only "at the end user product level, and not to chipsets or other components," and no license was concluded.

90.    In July 2017, u-blox was informed by its customer Bosch, through Bosch's downstream customer Daimler, that Daimler had been approached by Sisvel to "license Standard Essential Patents" for products incorporating u-blox products that are compatible with the 2G, 3G, and 4G standards.

91.    From October to December 2017, Kent Baker of u-blox in San Diego, California, reached out to Thomas Rosseler of Sisvel SA and Chuck Hausman of Sisvel US, again seeking a license to Sisvel and 3G Licensing's 2G, 3G, and 4G wireless portfolio.  Mr. Hausman finally responded on December 1, 2017.

92.    From December 2017 through June 2018, the parties communicated regularly and an in-person meeting was held in July 2018 where u-blox provided Sisvel with detailed information regarding its business, typical markets, and financial realities of u-blox's business, such as sales price of its modules, profit margins, and indemnity obligations.[3]  This information was exchanged in good faith

--------

[3] Upon information and belief, Sisvel was well aware of u-blox's obligations regarding indemnity obligations to customers for the cost of a FRAND rate paid for using its components.  For example, u-blox's general counsel Jan Schnitzer had

COMPLAINT

1    with Sisvel in order to explain why u-blox needed a license, and that a FRAND
2    royalty rate must take this information into account, otherwise it could have a
3    devasting effect on the business.

4          93.    In April 2018, Sisvel sent u-blox claim charts purporting to show how
5    some of Sisvel's patents cover portions of the standard.

6          94.    In November 2018, Sisvel made an licensing offer to u-blox, but the
7    offer far exceeded a FRAND royalty rate for u-blox's products, wholly disregarded
8    u-blox business case presented at the meeting, and did not incorporate any particular
9    u-blox circumstances, including, for example, profit margins.

10          95.    On June 20, 2019, Sisvel SA filed a patent infringement lawsuit against
11   Xirgo in the District of Delaware, Case No. 1:19-cv-01145.  In its complaint, Sisvel
12   asserts that Xirgo infringes U.S. Patent Nos. 6,529,561; 7,274,933; 7,433,698;
13   7,460,868; 7,596,375; 7,751,803; 7,894,443; 8,275,374; 8,364,196; 8,472,955;
14   8,879,503; and 8,948,756.

15          96.    On August 9, 2019, Mr. Baker sent Sisvel a counter-offer term sheet on
16   behalf of u-blox, along with a detailed cover letter explaining u-blox's counter-offer,
17   how the royalty rate was calculated, and why it was FRAND given u-blox business
18   circumstances, the price of its products, and a typical profit margin.

19          97.    Sisvel has since refused to provide u-blox with a counteroffer, refused
20   to explain why it believes u-blox's royalty calculation was not FRAND, and refused
21   to engage in negotiations of a FRAND license.

22          98.    u-blox is, and has always been, ready, willing, and able to enter into a
23   license to Sisvel's 2G, 3G, and 4G SEPs on FRAND terms and conditions.

24          99.    However, Sisvel has no intention of granting u-blox a license to its
25   allegedly essential 2G, 3G, and 4G patents on FRAND terms and conditions.

26          100.   Instead, Sisvel is incentivized to offer non-FRAND rates to u-blox,

27   _____

28   conversations with another Sisvel representative, Valentina Piola, where they
     discussed u-blox's indemnification obligations.

1  knowing that that u-blox cannot accept the offer, so that Sisvel can pursue a license

2  from u-blox's downstream customers where it can demand a royalty based on

3  products that incorporate the u-blox component and have higher average selling

4  prices.  As such, u-blox is confronted with an entirely unfair Hobson's choice:

5  refuse to capitulate to Sisvel's unreasonable demands and risk losing its customers

6  and business or agree to a license containing terms and conditions including an

7  unreasonable royalty rate that are not FRAND.  Given these clear hold-up

8  conditions, u-blox had no choice but to file this action.

9  **The Harm to u-blox and Industry Competition**

10      101.   In justifiable reliance upon Sisvel's and the prior owners' promises that

11  they would license their SEPs to u-blox and others on FRAND terms, u-blox has

12  made significant monetary investments into the research, development, production,

13  and marketing of its cellular modules.

14      102.   Sisvel also injures competition by intentionally aggregating patents

15  fractured off larger SEP holder's portfolios acquired from prior owners.  Sisvel

16  knowingly and intentionally seeks to acquire these patents and charge supra-

17  FRAND rates on a far higher per-patent basis then for what the prior owners could

18  have obtained when licensed with the entire portfolio.

19      103.   Additionally, Sisvel's licensing campaign introduces new and uncertain

20  costs to suppliers of electronics compatible with the standards—which were

21  implemented prior to the entry of these new non-practicing entity licensors into the

22  Relevant Markets.  These new and unexpected costs of negotiating and/or defending

23  litigation due to the unanticipated demands of supra-FRAND rates Sisvel seeks from

24  suppliers, were not, and could not have been calculated into deciding whether to

25  invest millions of dollars into research and development of its components, or in

26  determining their pricing—made years prior.  Therefore, Sisvel's licensing

27  campaign undermines competition and dampens innovation by causing less

28  investment into new products, and consequently harms the end consumer as

-24-

suppliers need to charge higher prices for their products.

104.   Based on the foregoing, u-blox seeks, *inter alia*:  (i) a judicial declaration that Sisvel and the prior owners' promises to ETSI, 3GPP, and their respective members and affiliates to license their SEPs on FRAND terms and conditions constitute contractual obligations with u-blox and other implementers as intended third party beneficiaries; (ii) a judicial declaration that Sisvel has breached these obligations by demanding excessive, unfair, unreasonable, and discriminatory royalties from u-blox; (iii) a judicial decree enjoining Sisvel from further demanding excessive royalties from u-blox and u-blox's customers that are not consistent with Sisvel's FRAND obligations; (iv) a judicial accounting of what constitutes a FRAND royalty rate going forward in all respects consistent with Sisvel's commitment to license its patents identified as (or alleged to be) potentially or actually "essential" to the 2G, 3G and/or 4G standards; (v) a judicial determination that Sisvel's refusal to agree to a FRAND license is a breach of Sisvel's commitments to ETSI; (vi) a judicial determination that Sisvel's deceptive and deliberately false declarations to ETSI, and the disclosure misconduct of the prior owners (either alone or in combination), constitute violations of Section 2 of the Sherman Act; (vii) a judicial determination that Sisvel's acquisition and use of SEPs violates Section 7 of the Clayton Act; (viii) a declaration that patents associated with the disclosure misconduct of one or more of the prior owners' are not enforceable; and (x) all other relief to which u-blox may be entitled.

**CLAIMS FOR RELIEF**
**FIRST CAUSE OF ACTION**
**(Breach Of Contract)**

105.   u-blox re-alleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

106.   Sisvel and/or its predecessors-in-interest, *i.e.*, the prior owners, entered into contractual commitments with ETSI, 3GPP and their respective members,

participants, and implementers relating to the 2G, 3G, and 4G standards.  As ETSI members, and to comply with ETSI's IPR Policy, Sisvel and/or the prior owners made binding commitments to ETSI, ETSI members, and third party implementers to disclose intellectual property rights relevant to the 2G, 3G, and 4G standards, and to grant irrevocable licenses to the alleged SEPs at issue on FRAND terms and conditions.

107.   The ETSI IPR Policy provides that the prior owners' obligations and commitments to ETSI and/or its members and third party beneficiaries are transferred with the relevant patents to Sisvel.  *See* Clause 6 of the ETSI IPR Policy (providing that it "shall be interpreted as encumbrances that bind all successors-in-interest").

108.   The ETSI membership and standards setting activities affirmed by Sisvel and/or the prior owners, including the IPR declarations both the prior owners and Sisvel made to comply with ETSI's IPR policy with respect to the alleged SEPs Sisvel is purporting to license, created an express and/or implied contract with ETSI and/or ETSI members, including an agreement that Sisvel would license those patents on FRAND terms and conditions.  ETSI's IPR Policy does not limit the right to obtain a license on FRAND terms and conditions to ETSI members; third parties that are not ETSI members also have the right to be granted licenses under those patents on FRAND terms and conditions.  Each and every party with products that implement the 2G, 3G, and/or 4G standards promulgated by ETSI is an intended third-party beneficiary of these contractual commitments, including u-blox, its suppliers, its customers, and their downstream manufacturers.

109.   However, despite u-blox's good faith efforts to negotiate a license to Sisvel's alleged SEPs, Sisvel is refusing to offer u-blox a license on FRAND terms and conditions.

110.   Sisvel has breached its FRAND obligations by refusing to license its SEPs to u-blox at reasonable rates, with reasonable terms, and on a non-

discriminatory basis.

111.   As a result of Sisvel's contractual breach, u-blox has been injured in its business or property and is threatened with loss of profits, loss of customers and potential customers, and loss of goodwill and product image.

112.   u-blox has suffered and will continue to suffer injury by reason of the acts, practices, and conduct of Sisvel alleged herein until and unless the Court enjoins such acts, practices, and conduct.

## SECOND CAUSE OF ACTION
### (Declaratory Judgment)

113.   u-blox re-alleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

114.   Sisvel is contractually obligated to license its 2G, 3G, and 4G SEPs on FRAND terms and conditions.  There is a dispute between the parties concerning whether Sisvel has offered u-blox a license to its SEPs on FRAND terms and conditions consistent with Sisvel's and/or the prior owners' irrevocable commitments in declarations to ETSI and the referenced IPR policy of ETSI and/or 3GPP.

115.   Sisvel has sued u-blox's customer Xirgo for patent infringement based on its products that use u-blox products, for at least some of the patents to be included in the license that Sisvel and u-blox are negotiating.

116.   As a result of the acts described herein, there exists a definite and concrete, real and substantial, justiciable controversy between u-blox and Sisvel regarding what constitutes FRAND terms and conditions for a license to Sisvel's 2G, 3G, and 4G SEPs with respect to u-blox's products.  This dispute is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

117.   u-blox is entitled to a declaratory judgment that Sisvel has not offered license terms to u-blox conforming to applicable legal requirements, including

-27-

1  failing to offer u-blox a license to its 2G, 3G, and/or 4G SEPs on FRAND terms and

2  conditions.  Moreover, u-blox is entitled to a declaratory judgment that sets the

3  FRAND terms and conditions, including but not limited to the FRAND royalty rate,

4  for a license to Sisvel's 2G, 3G, and 4G SEPs.

### THIRD CAUSE OF ACTION
#### (Antitrust Violations Of Section 2 Of The Sherman Act, 15 U.S.C. § 2, and Section 7 of the Clayton Act, 15 U.S.C. § 18)

8  118.   u-blox re-alleges and incorporates by reference the allegations set forth

9  in the foregoing paragraphs.

### Relevant Markets

11  119.   For the purposes of u-blox's antitrust claim, the relevant markets are

12  the technologies covered by the Sisvel ETSI-declared essential patents — inclusive

13  of those issued in the United States and elsewhere — that Sisvel has purported to

14  offer to license to u-blox for products that implement the 2G, 3G, and 4G standards,

15  together with all other alternative technologies to the Sisvel technologies that could

16  have been incorporated into the standards (collectively, the "Relevant Technology

17  Markets").  Sisvel holds monopoly power in the various Relevant Technology

18  Markets for the various functions claimed to be covered by their declared SEPs,

19  because formerly viable alternative technologies are no longer viable because of the

20  lock-in effect of standards.

21  120.   The technologies that perform each of the 2G, 3G, and/or 4G functions

22  are essential inputs into the manufacture and supply of products and services that

23  support the standards.  If a technology selected for inclusion in the standard is

24  protected by patents, the patent owner controls the supply of that particular input

25  technology for the standard.  This is true for each function comprising the standard

26  for which patented technology was selected.  The functionality of the standards

27  associated with each input technology also comprises a relevant market for antitrust

28  purposes (the "Input Technology Markets").  Sisvel holds monopoly power in the

1  various Input Technology Markets for the various functions claimed to be covered

2  by their declared SEPs, because formerly viable alternative technologies are no

3  longer viable because of the lock-in effect of standards.

4      121.   The relevant markets have high barriers to entry because the

5  standardization process eliminates the viability of alternative technologies as

6  substitutes.

7                    **SSO's Adoption of Technology to a Standard**

8      122.   In the ETSI standard-setting environment, ETSI members gather

9  together various technology in a consensus-oriented setting, to decide which

10  technology should be adopted into the standard.

11      123.   Under the ETSI IPR policy, "[d]uring the proposal or development of a

12  standard, ETSI members must inform the Director General in a timely fashion if

13  they are aware that they hold any patent that might be essential."[4]

14      124.   The ETSI IPR policy is designed as such to allow its members deciding

15  which technology should be adopted into the standard to analyze whether or not the

16  technology will be subject to a FRAND commitment, in order to weigh the costs

17  and benefits of implementing the potential technology.  Without timely disclosure of

18  IPRs, a technology holder would obtain an unfair business advantage through the

19  patents they obtain if they are essential to the standard.

20      125.   Once ETSI adopts technology for a mobile standard, the owner of each

21  essential patent that covers technology incorporated into that standard obtains

22  monopoly power in a Relevant Technology Market.  This is because when patented

23  technology is incorporated in a standard, adoption of the standard eliminates

24  alternatives to the patented technology, and companies wanting to market devices

25  that comply with the standard are locked in and must use the patented technology.

26      126.   As previously discussed, as members of ETSI the prior owners were

27

28  [4] ETSI IPR Policy, Section 4.1 at 1; *see also* ETSI website at
    https://www.etsi.org/intellectual-property-rights.

required to timely disclose their IPRs in order for ETSI and its other members to consider when determining which technology to adopt in the standards.  This is particularly true where the prior owner has proposed that technology covered by its IPRs should be included in a standard.  However, as explained below, some of the prior owners failed to timely disclose their IPR.

127.   Likewise, Sisvel and/or the prior owners have declared many of their patents to be potentially essential to one or more of the standards and made irrevocable undertakings to license such patents that are or become and remain essential on FRAND terms and conditions.

128.   Before the adoption of the standards, competitors in the Relevant Technology Markets included companies with technology capable of performing the same or equivalent functions that ETSI and its members could have adopted.  These additional competitors include the companies that offered technologies that could have been used in alternative mobile standards that were foreclosed once ETSI members adopted a standard that included Sisvel's and/or a prior owners' technologies.  Because of the lock-in effect described above, Sisvel and/or the prior owners became the only commercially viable sellers inside and outside the United States in each of the Relevant Technology Markets.

129.   After the standards were set, u-blox and other manufacturers invested significant revenue and other resources developing products that practice the standards.  Those investments were made in reliance on the FRAND commitments made by prior owners and/or Sisvel.  Likewise, as the standards evolved and additional versions of the standards were adopted, ETSI and its members relied on the FRAND commitments to keep the prior technology—because had the technologies holders affirmatively stated that they would not offer FRAND rates, the ETSI members could have worked on implementing a design around in later versions.

130.   u-blox and the other implementers in the Relevant Technology Markets

were effectively locked in to practicing Sisvel's patented technologies when they were allegedly adopted into the standard.  As a result, alternatives to such technologies no longer constrained Sisvel's ability to demand royalty rates far in excess of the value that the patented technologies would have prior to the adoption of the standard, when alternatives were available ("*ex ante*").

### Sisvel's Misconduct

131.   Courts, regulators, and economists have made clear that to be effective, the FRAND commitments in ETSI's IPR policy should: (a) limit royalties to the value that the SEP(s) had prior to inclusion in the ETSI standard and in light of other patented and unpatented technology essential to the standard; (b) prohibit charging royalties that are higher based upon the technology being written into the standard or that capture the value of the standard itself; and (c) require non-discriminatory treatment of licensees and potential licensees.

132.   ETSI's FRAND commitment grants implementers the right to practice claimed SEPs.  Participants in standards development and third-party implementers in the Relevant Technology Markets rely on these irrevocable contractual undertakings to ensure that the widespread adoption of the standard will not be hindered by SEP owners attempting to extract unreasonable royalties and terms from those implementing the standard.

133.   However, Sisvel has engaged in an unlawful scheme to exploit its undue market power over technologies necessary for implementers, including u-blox, to practice the 2G, 3G, and/or 4G standards.  Sisvel's market power is due solely to its and/or its prior owners' intentionally false commitments to license their alleged SEPs on FRAND terms and conditions, which commitments were necessary to keep the technology allegedly covered by the relevant SEPs in the standard(s) and to get such technology into the standards in the first instance.

134.   Participants in the 2G, 3G, and/or 4G standardization, including all ETSI members and u-blox in particular, relied on Sisvel's and/or the prior owners'

intentionally false promises to license their alleged SEPs on FRAND terms and conditions in choosing to incorporate those allegedly essential patented technologies into the standards and/or to keep such technologies in the standards.

135.   As a result of Sisvel's false FRAND commitments, technology allegedly covered by its SEPs was included and/or kept in the standards to the exclusion of alternative technologies.  Through its deceptive acts and practices, Sisvel is unlawfully monopolizing the Relevant Technology Markets.

136.   Therefore, u-blox asserts this claim to obtain a FRAND license and enjoin Sisvel from continuing its abusive licensing practices and Sisvel's unlawful monopolization in certain relevant markets for 2G, 3G, and/or 4G cellular technologies.

**Standards Setting Misconduct of the Prior Owner Adopted by Sisvel**

137.   U.S. Patent No. 7,433,698 ("the '698 Patent"), attached hereto as Exhibit 4, titled "Cell Reselection Signaling Method," was filed on July 12, 2002, and was based on a PCT application filed on January 17, 2000.  U.S. Patent and Trademark Office ("USPTO") records indicate that Sisvel is the assignee of the '698 Patent.  U.S. Patent No. 8,364,196 ("the '196 Patent"), attached hereto as Exhibit 5, titled "Cell Reselection Signaling Method," was filed on August 19, 2008, and is a continuation application of the '698 Patent.  USPTO records indicate that Sisvel is the assignee of the '196 Patent.

138.   There is a dispute between the parties concerning whether certain u-blox products infringe one or more claims of the '698 Patent and/or the '196 Patent. During the course of licensing negotiations, Sisvel asserted that u-blox products infringe one or more of the '698 and '196 Patent claims by virtue of practicing the 3G UMTS standard.  Sisvel provided u-blox with a claim chart alleging that the '698 and '196 Patents are essential to the UMTS standard.

139.   The '698 and '196 Patents are subject to all preexisting legal and/or

-32-

equitable encumbrances that Sisvel assumed upon transfer of these patents from Nokia, a prior owner, and are subject to all legal and/or equitable consequences arising therefrom.  These encumbrances include Nokia's obligation to license the '698 and '196 Patents on fair, reasonable, and non-discriminatory terms and conditions.

140.   Additionally, Nokia had an obligation to ETSI and its members to timely disclose the IPRs associated with the '698 and '196 Patents (or patents or patent applications within the same family) in accordance with the requirements of the ETSI IPR Policy.  Clause 4.1 of the IPR Policy required, as early as 1994, that "[e]ach MEMBER shall use its reasonable endeavours [sic] to timely inform ETSI of ESSENTIAL IPRs it becomes aware of.  In particular, a MEMBER submitting a technical proposal for a STANDARD shall, on a bona fide basis, draw the attention of ETSI to any of that MEMBER's IPR which might be ESSENTIAL if that proposal is adopted."  Nokia was bound by the ETSI IPR Policy during its participation at ETSI and also at 3GPP, of which ETSI is an organizational member.

141.   Nonetheless, Nokia failed to disclose the existence of its claimed IPRs during the standardization of the relevant cellular standards at ETSI and 3GPP, while at the same time advocating for the adoption of technology into those standards that Sisvel asserts is covered by the '698 and '196 Patents.

142.   Nokia's misconduct in failing to timely disclose IPRs, while urging that such technology be adopted into the standards, constitutes at least a waiver and/or estoppel of its rights to enforce any claimed essential patents against any entity practicing the standard and renders the patents unenforceable.  The timeline for the late disclosure of the '698 and the '196 Patents is described below.

143.   On January 17, 2000, Nokia filed Finnish Patent Application No. 20000090.  On July 12, 2002, Pekka Marjelund, Juha Turunen, Kaisu Iisakkila, and Oscar Salonaho filed U.S. Patent Application No. 10/181,078 (later assigned to Nokia Corporation), which issued as the '698 Patent on October 7, 2008.  The '698

-33-

1    Patent claims priority to Finish Patent Application No. 20000090.  Based off the

2    same application, the '196 Patent was filed on August 19, 2008, and is a

3    continuation application of the '698 Patent.

4          144.   Sisvel has represented that the '698 and '196 Patents are essential to

5    practicing 3GPP Technical Specification ("TS") 25.331, as it relates to UMTS (u-

6    blox disputes that these patents are actually essential or infringed).  Nokia

7    employees participated in the standardization of TS 25.331, including by submitting

8    technical proposals and change requests to 3GPP.  Namely, between January 17 and

9    20, 2000, Nokia submitted document R2-000067, titled "Redirection of RRC

10   Connection Setup," and document R2-000238, with the subject "Redirection of

11   RRC connection setup," to 3GPP during working group meetings in San Diego,

12   California.  Nokia's submissions were accepted and incorporated into Version 3.2.0

13   of TS 25.331, which was published March 15, 2000.

14         145.   Nokia did not disclose the Finnish Application No. 20000090, or any

15   other application or patent in the family of the '698 and '196 Patents, to ETSI or to

16   3GPP at any time (1) after submitting documents R2-000067 and R2-000238 to

17   3GPP and advocating for the adoption of the technology proposed therein, or (2)

18   before Version 3.2.0 of TS 25.331 was published.  In fact, Nokia waited until

19   December 21, 2001 to first declare that any member of the '698 and '196 Patent

20   family was potentially essential to TS 25.331 or any other ETSI or 3GPP standard

21   — *i.e.*, nearly two years after Nokia's submissions to 3GPP and after Version 3.2.0

22   of TS 25.331 was published.

23         146.   Nokia's failure to disclose its IPRs to ETSI while submitting at least

24   one proposal that was later adopted into the standard injured competition by

25   excluding alternative technologies which could have been included in the standard.

26         147.   When Sisvel acquired the '698 and '196 Patents from Nokia, Sisvel

27   stepped into Nokia's shoes, and Nokia's standard setting misconduct transferred to

28   Sisvel with the patents.  When Sisvel acquired these patents, Sisvel either knew or

should have known by performing its due diligence on the patents, that Nokia failed to timely disclose its IPR to ETSI prior to its proposal being adopted into the standard.  Yet, Sisvel filed an supplemental IPR declaration for these patents, and indicated additional sections to which the IPR was relevant.  Sisvel continues to assert the patents against implementers of the standards, including u-blox and its customer Xirgo, and seeks non-FRAND royalty rates, even though Sisvel knew or should have known that Nokia waived its right to enforce these patents.  As a direct and proximate consequence of Sisvel's unlawful monopolization of the technology allegedly covered by the '698 and '196 Patents, customers of the Relevant Technology Markets (implementers of the standards such as u-blox) face drastically higher costs for access to cellular technologies necessary for the manufacture of standard-compliant products than they would have paid in a competitive marketplace.

### Sisvel's Antitrust Violations

148.   Sisvel's wrongful conduct prevents u-blox from obtaining access to alternative technologies in the Relevant Technology Markets.  The antitrust injury associated with Sisvel's unlawful monopolization also extends to consumers in the downstream market for the technology, such as u-blox's cellular modules, in the form of higher prices, reduced innovation, and more limited choice for such standard-compliant products.  Indeed, the necessary result of raising costs to some competing manufacturers in the marketplace for standard-compliant products and diverting resources that otherwise would have fueled additional innovation is to limit consumer choices in complementary technologies and other technology used in standard-compliant products.

149.   Sisvel has leverage over manufacturers of standard-compliant products that it would not possess but for Nokia's standards setting misconduct and/or Sisvel's false promises to ETSI to license its alleged SEPs on FRAND terms and conditions, and Sisvel's unlawful acquisition of monopoly power in the '698 and

'196 Patents and the Relevant Technology Markets.  As a result of said leverage, manufacturers of standard-compliant products, including u-blox, must either capitulate to Sisvel's demand for supra-competitive royalty rates or face the costs and risks of protracted patent litigation on a global scale and/or interference with customer relationships.

150.   Sisvel knowingly acquired patents from prior owners with a false promise to license the patents on FRAND terms and with the intent to seek supra-FRAND rates on a far higher per-patent basis then for what the prior owners could have obtained when licensed with the entire portfolio.  Sisvel likewise aggregated weak patents together from various prior owners to acquire a monopoly in SEPs related to 2G, 3G, and 4G patents.  Moreover, Sisvel knew or should have known of the disclosure misconduct by prior owner(s), and intentionally sought a non-FRAND license for patents that should be deemed unenforceable.

151.   After acquiring its unlawful monopolization of the Relevant Technology Markets and Input Technology Markets, Sisvel has exploited this ill-gotten power against u-blox by refusing to offer a license on FRAND terms, by among other things:

- Refusing to honor its obligation to license its alleged SEPs on FRAND terms and conditions;

- Seeking supra-competitive royalty rates from u-blox for a license to Sisvel's 2G, 3G, and 4G patents;

- Demanding u-blox pay royalties for alleged SEPs covering portions of the standards not practiced by u-blox's products;

- Demanding u-blox pay royalties for expired patents or patents that will expire during the course of the proposed license; and

- Demanding u-blox pay royalties for patents that Sisvel knew or should have known were not enforceable due to a prior owners' untimely disclosure of their IPR to ETSI/3GPP.

-36-

152.   Sisvel's and/or the prior owner's actions injure competition by excluding alternate technologies which could have been included in the standard. As a direct and proximate consequence of Sisvel's unlawful monopolization, customers of the Relevant Technology Markets and/or Input Technology Markets (e.g., implementers of the standards such as u-blox and/or u-blox's customers) face drastically higher costs for access to cellular technologies necessary for the manufacture of standard-compliant products than they would have paid in a competitive marketplace.

153.   Absent Sisvel's and/or the prior owner's wrongful conduct, which resulted in alternate technologies being excluded from the relevant standards, u-blox and other implementors would be able to obtain a license to access necessary technology in the Relevant Technology Markets on fair, reasonable, and non-discriminatory terms.

154.   Therefore, to prevent harm to u-blox's business and property, including its cellular module products, and further harm to competition more generally in the Relevant Technology Markets, u-blox brings this action for treble damages, declaratory relief, and injunctive relief under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26.

155.   As a member of ETSI and an active participant in 2G, 3G, and/or 4G consensus standardization efforts through 3GPP, Sisvel and/or the prior owners were obligated to comply with the ETSI IPR Policy.  That policy requires the owner of patents that might be essential to a standard to file an IPR disclosure statement that among other things contains an irrevocable commitment to be prepared to license the disclosed IPRs on FRAND terms and conditions to those who implement the relevant standards, should those IPRs be or become and remain essential.

156.   Over time, to secure inclusion of its own proposed technology in the evolving 2G, 3G, and/or 4G standards, as well as other technology allegedly covered by its patents, Sisvel and/or the prior owners submitted IPR Declarations in

which they promised to license their patents on FRAND terms and conditions.  As a result of these IPR disclosures, their patented technologies that were allegedly incorporated into and/or remained incorporated in the standards, and other alternative technologies that would otherwise have been considered for inclusion in the standard were not adopted.

157.   Sisvel's and/or its prior owner's promises to license the allegedly essential patents on FRAND terms and conditions were intentionally false and misleading.  Sisvel had no intention of licensing its alleged SEPs on FRAND terms and conditions.  Additionally, some of the prior owners' promises to timely disclose their IPRs, and in particular when proposing their own technologies for adoption into the standard, were intentionally false and misleading.  Some of the prior owners had no intention of disclosing their IPRs prior to the adoption and/or publication of the relevant standards.

158.   Indeed, as explained above, with u-blox, Sisvel is attempting to exploit its undue monopoly power by attempting to extract supra-competitive royalty rates, to force u-blox to pay royalties on expired patents, and to charge u-blox the same royalty rates for components that may not even practice Sisvel's alleged SEPs because they use low-speed LTE category standards instead of using high-speed LTE category standards – among other FRAND violations.

159.   As a result of the incorporation of technologies into the 2G, 3G, and/or 4G standards that Sisvel asserts its patents cover, Sisvel has monopoly power in the markets for those technologies.  Because such technologies have been incorporated into the standards, products that are designed to comply with the 2G, 3G, and/or 4G standards are locked in to those technologies, and cannot use alternative technologies.  As a result, Sisvel has the power to extract supra-competitive prices for licenses to these technologies.  Accordingly, Sisvel has a dominant market share in the markets for these technologies and the markets have significant barriers to entry post-standardization.

1      160.   Sisvel has obtained and maintained its market power in these

2  technology markets willfully and not as a consequence of a superior product,

3  business acumen, or historic accident.  Sisvel and/or the prior owners excluded

4  competition through their intentional non disclosures and/or false promises to

5  license patents covering the relevant technologies on FRAND terms.  ETSI and its

6  members relied on these promises in choosing to incorporate technologies allegedly

7  related to Sisvel's SEPs and/or advocating for such technologies to remain in the

8  standards.

9      161.   Sisvel's and/or the prior owners' deceptive conduct induced 3GPP and

10  ETSI, through the voluntary consensus driven processes they use, to incorporate

11  technology into the 2G, 3G, and/or 4G standards or to keep technology in those

12  standards that they would not have incorporated or kept absent a FRAND

13  commitment.

14      162.   Sisvel's actions show that it never intended to comply with its promises

15  to license its allegedly essential patents on FRAND terms and conditions.  Sisvel

16  refuses to engage with u-blox's good faith efforts to obtain a license under fair,

17  reasonable, and non-discriminatory terms and conditions.  Instead, Sisvel is insisting

18  that u-blox pay royalty rates that are several times higher than justified by the value

19  or strength of Sisvel's portfolio.  Additionally, Sisvel is demanding these

20  unjustifiably high royalty rates on patents that it either knew, or should have known,

21  are unenforceable due to the prior owners' disclosure misconduct.  Furthermore, the

22  prior owners' disclosure misconduct shows that they had never intended to comply

23  with their obligation to disclose their IPR prior to the publication or adoption of the

24  relevant standards, in particular, where they specifically proposed their IPR to be

25  included in the standards.

26      163.   These anticompetitive acts are an abuse of Sisvel's monopoly power in

27  the relevant worldwide markets and establish a violation of Section 2 of the

28  Sherman Act.

164.   Additionally, Sisvel has wrongfully acquired numerous patents (or interests in patents) which are assets under Section 7 of the Clayton Act.  Those anticompetitive acquisitions include those listed in the Sisvel LTE and 3G Licensing Brochures.  Ex. 1—Ex. 2.  The effects of these acquisitions, and the control that Sisvel SA has over 3G Licensing have been to lessen competition substantially, and tend to create market power, including in the Relevant Market.  Among other harms, Sisvel's acquisitions have significantly enhanced Sisvel's ability and incentives to harm competition, evading constraints on patent assertion, and creating incentives to assert patents aggressively and thus increasing the cost and likelihood of litigation.

165.   Sisvel's acquisitions have been for an anticompetitive purpose—to allow it to assert hold-up values that exceed the values of the SEPs.

166.   As a direct, proximate, and foreseeable result of Sisvel's unfair and wrongful conduct, as alleged above, there is a significant threat of harm to consumers, including through the inevitable passing on to customers the inflated royalties demanded for Sisvel's alleged SEPs.  The anticompetitive acquisitions have thus harmed consumers for cellular components, such as those sold by u-blox.

167.   As a direct, proximate, and foreseeable result of the unlawful patent acquisitions, u-blox has suffered or will suffer harm to its business and property, and absent an injunction and rescission of these transactions, u-blox will continue to suffer from these effects.  u-blox's past and continuing harm include the risk of supra-competitive licensing rates, business uncertainty, litigation costs, and business resources lost in dealing with the consequences of Sisvel's unlawfully-acquired patents.

## FOURTH CAUSE OF ACTION
### (Declaratory Judgment of Unenforceability of U.S. Patent No. 7,433,698)

168.   u-blox re-alleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

169.   The Federal Circuit has found that even when a patent is otherwise valid, a member of an open standard setting organization may have impliedly waived its right to assert infringement claims against standard-compliant products or components due to disclosure misconduct, thereby making the patent unenforceable. *See Core Wireless Licensing S.A.R.L. v. Apple, Inc.*, 899 F.3d 1356 (Fed. Cir. 2018); *Hynix Semiconductor Inc. v. Rambus Inc.*, 645 F.3d 1336, 1347–48 (Fed. Cir. 2011) (quoting *Qualcomm Inc. v. Broadcom Corp.* ("*Qualcomm II*"), 548 F.3d 1004, 1019 (Fed. Cir. 2008)).  In particular, "[i]f the patentee obtained 'an unjust advantage' or 'an undeserved competitive advantage,' the implied waiver doctrine may justify a sanction of unenforceability of the patent at issue." *Conversant Wireless Licensing S.A.R.L. v. Apple, Inc.*, No. 15-cv-05008-NC, slip op., Dkt. 547, at 8 (N.D. Cal. May 10, 2019) (citing *Therasense*, 649 F.3d at 1292).  A patent owner can obtain such an unfair advantage by failing to timely disclose an essential patent that covers technology proposed to a standard.  *Id.*

170.   The '698 Patent is subject to all preexisting legal and/or equitable encumbrances that Sisvel assumed upon transfer of these patents from Nokia and is subject to all legal and/or equitable consequences arising therefrom.  *See ¶¶* 140-147.

171.   There is a dispute between the parties concerning whether certain u-blox products infringe one or more claims of the '698 Patent.  Sisvel has asserted that u-blox products infringe one or more of the '698 Patent claims by virtue of practicing the 3G UMTS standard.

172.   u-blox alleges that the '698 Patent is unenforceable due to Nokia's disclosure misconduct.  Namely, Nokia (a prior owner of the '698 Patent) had a duty to disclose to ETSI and/or 3GPP its IPR prior to the standard being adopted, and in particular where Nokia provided a proposal that "might" be essential to the standard if adopted.  Nokia breached this duty by first, in January 2000, submitting technical proposals for technology to be included in the TS 25.331 standard, where Nokia had

filed a patent relating to such proposals in 1999, and then waiting until December 21, 2001 to first declare that any member of the '698 Patent family was potentially essential to TS 25.331 or any other ETSI or 3GPP standard—i.e., nearly two years after making its submissions to 3GPP and after Version 3.2.0 of TS 25.331 was published—which is when the relevant version of the standard was adopted. Nokia's misconduct in failing to timely disclose IPRs, while urging that technology allegedly covered by such IPRs be adopted into the standards, constitutes at least a waiver of its rights to enforce any claimed essential patents against any entity practicing the standard and renders the '698 Patent unenforceable.

173.    Moreover, Nokia, and therefore Sisvel, received an unfair competitive advantage, in the form of the right to assert an allegedly standard essential patent and extract royalties from industry participants for the '698 Patent.  *See Core Wireless*, 899 F.3d at 1368 (quoting *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1292 (Fed. Cir. 2011) (en banc)); *Conversant*, No. 15-cv-05008-NC, Dkt. 547, at 8.

174.    Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, u-blox requests a declaration of the Court that that the '698 Patent is unenforceable.

## FIFTH CAUSE OF ACTION
### (Declaratory Judgment of Unenforceability of U.S. Patent No. 8,364,196)

175.    u-blox re-alleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

176.    As patent may be unenforceable due to disclosure misconduct in a standards setting organization. *See supra* ¶169.

177.    As described above, the '196 Patent is subject to all preexisting legal and/or equitable encumbrances that Sisvel assumed upon transfer of these patents from Nokia and is subject to all legal and/or equitable consequences arising therefrom.  *See ¶¶* 140-147.

-42-

178.   There is a dispute between the parties concerning whether certain u-blox products infringe one or more claims of the '196 Patent.  Sisvel has asserted that u-blox products infringe one or more of the '196 Patent claims by virtue of practicing the 3G UMTS standard.

179.   u-blox alleges that the '196 Patent is unenforceable due to Nokia's disclosure misconduct.  Namely, Nokia (a prior owner) had a duty to disclose to ETSI and/or 3GPP its IPR related to the '196 Patent prior to the standard being adopted, and in particular where Nokia provided a proposal that "might" be essential to the standard if adopted.  Nokia breached this duty by first, in January 2000, submitting technical proposals for technology to be included in the TS 25.331 standard, where Nokia had filed a patent relating to such proposals in 1999, and then waiting until December 21, 2001 to first declare that any member of the '196 Patent family was potentially essential to TS 25.331 or any other ETSI or 3GPP standard— i.e., nearly two years after making its submissions to 3GPP and after Version 3.2.0 of TS 25.331 was published—which is when the relevant version of the standard was adopted.  Nokia's misconduct in failing to timely disclose IPRs, while urging that technology allegedly covered by such IPRs be adopted into the standards, constitutes at least a waiver of its rights to enforce any claimed essential patents against any entity practicing the standard and renders the '196 Patent unenforceable.

180.   Moreover, Nokia, and therefore Sisvel, received an unfair competitive advantage, in the form of the right to assert an allegedly standard essential patent and extract royalties from industry participants for the '196 Patent.  *See Core Wireless*, 899 F.3d at 1368 (quoting *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1292 (Fed. Cir. 2011) (en banc)); *Conversant*, No. 15-cv-05008-NC, Dkt. 547, at 8.

181.   Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, u-blox requests the declaration of the Court that the '196 Patent is unenforceable.

-43-

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, u-blox prays for relief as follows:

A.      Adjudge and decree that Sisvel is liable for breach of its contractual commitments to ETSI;

B.      Adjudge and decree that Sisvel has not offered u-blox a license to its 2G, 3G, and/or 4G SEPs under fair and reasonable rates, with fair and reasonable terms and conditions that are demonstrably free of any unfair discrimination;

C.      Adjudge, set, and decree the FRAND terms and conditions that u-blox is entitled to for a license to Sisvel's 2G, 3G, and/or 4G SEPs;

D.      Enjoin Sisvel from demanding excessive royalties from u-blox that are not consistent with Sisvel's FRAND obligations;

E.      Adjudge and decree that u-blox is entitled to a license from Sisvel for any and all patents that Sisvel deems "essential" and/or has declared potentially "essential" to the 2G, 3G, and/or 4G standards under reasonable rates, with reasonable terms and conditions that are demonstrably free of any unfair discrimination;

F.      Enjoin Sisvel from enforcing its 2G, 3G, and/or 4G SEPs against u-blox and/or any of its downstream manufactures or customers;

G.      Enjoin Sisvel from forcing u-blox to take a bundled license to Sisvel's SEPs that are not implemented by the portions of the 2G, 3G, and/or 4G standards practiced by u-blox's products;

H.      Adjudge and decree that Sisvel has violated Section 2 of the Sherman Act and enjoin Sisvel from further violations of that statute;

I.      Adjudge and decree that Sisvel has violated Section 7 of the Clayton Act, 15 U.S.C. § 18 and declare void all contracts or agreements that Sisvel entered into in violation of the Clayton Act and the patents improperly acquired by Sisvel be transferred back to the transferors;

J.      That all patents transferred to Sisvel in violation of the Sherman Act or

-44-

COMPLAINT

Clayton Act be declared unenforceable;

K.     Adjudge and decree that the '698 Patent is unenforceable;

L.     Adjudge and decree that the '196 Patent is unenforceable;

M.     Enter a judgment awarding u-blox its expenses, costs, and attorneys' fees with interest, under applicable laws;

N.     For such other and further relief as the Court deems just and proper.

Dated:  March 16, 2020

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By     /s/ Stephen S. Korniczky
STEPHEN S. KORNICZKY
MARTIN R. BADER
DANIEL L. BROWN
ERICKA J. SCHULZ

*Attorneys for Plaintiffs*

-45-

COMPLAINT